UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO

In Re:                              )
                                    )     **JUDGE RICHARD L. SPEER**
Arts Dairy, LLC                     )
                                    )     Case No. 09-32386
        Debtor(s)                   )
                                    )

**MEMORANDUM OF DECISION AND ORDER**

On May 20, 2010, the Court held a Hearing on the Objection of AgStar Financial Services to Confirmation of the Debtor's second modified proposed plan of reorganization. At the time of the Hearing, the Debtor was operating as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code. Prior to the Hearing on Confirmation, an evidentiary hearing was held on approval of the Debtor's Amended Disclosure Statement during which extensive evidence was offered regarding the feasibility of the Debtor's proposed plan of reorganization under 11 U.S.C. § 1129(a)(11). (Doc. No. 194). It was agreed by the Parties that the evidence and arguments offered at this earlier hearing were relevant and were to be merged into the Hearing held on Confirmation.

For its objection to Confirmation, AgStar Financial Services requested that this Court enter an order "denying confirmation of Debtor's Second Modified Plan of Reorganization." (Doc. No. 300). In support of its objection, AgStar Financial Services (hereinafter "AgStar") set forth two overall grounds as the basis for denying confirmation of the Debtor's proposed plan of reorganization: (1) the plan was not "feasible" as required by 11 U.S.C. § 1129(a)(11); and (2) the Debtor's proposed treatment of its claim, falling within an impaired and non-accepting class, did not accord its claim "fair and equitable" treatment as mandated by 11 U.S.C. § 1129(b)(1).

At the conclusion of the Hearing held on Confirmation, the Court sustained AgStar's Objection, finding that the Debtor had failed to show that its second modified plan was feasible for

In re: Arts Dairy, LLC
Case No. 09-32386

purposes of 11 U.S.C. § 1129(a)(11). No specific finding was made concerning the "fair and equitable" requirement of § 1129(b)(1). The following memorializes this decision, and shall constitute this Court's findings of fact and conclusions of law for purposes of Bankruptcy Rules 7052 and 9014.

## BACKGROUND

The Debtor, Arts Dairy, LLC (hereinafter the "Debtor"), is a limited liability company formed in 2000 for the purpose of operating a dairy farm. Subject to some fluctuation, the Debtor has ten employees. The principals and sole owners of the Debtor are Henk and Helma Arts (hereinafter the "Arts"), who, as husband and wife, manage every aspect of the Debtor's business operation. On April 14, 2009, the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the United States Bankruptcy Code.

The financial information submitted by the Debtor shows that in the years preceding its bankruptcy filing, it experienced the following profits/losses: (1) 2001, a loss of $113,391; (2) 2002, a loss of $194,889; (3) 2003, a loss of $314,366; (4) 2004, a profit of $121,807; (5) 2005, a loss of 245,772; (6) 2006, a loss of $926,885; (7) 2007, a profit of $612,035; (8) 2008, a loss of $766,334. (Ex. GGG). In 2009, the year it filed for bankruptcy relief, the Debtor had a net operating loss of $1,321, 968, including losses of $617,466 since filing for bankruptcy relief. (Doc. No. 227).

For the first three months in 2010, the Debtor reported an operating loss of $84,361. The financial projections provided by the Debtor in support of its plan of reorganization show that it expects to continue losing money through at least October of 2010. (Doc. No. 283, Ex. 6).

At the time it filed for bankruptcy relief, the Debtor represented that it had assets worth $2,774.502.65 and liabilities totaling $7,582,196.90. (Doc. No. 1). The $7,582,196.90 in liabilities

Page 2

In re: Arts Dairy, LLC
Case No. 09-32386

listed by the Debtor consisted of secured obligations, totaling $6,352,944.43 in value, with the remaining $1,229,252.47 in liability constituting unsecured, nonpriority debt. The entire value of the secured debt is held by AgStar who stipulated that, for purposes of confirmation, its collateral had a value of $6,100,000.

The secured debt owed to AgStar was incurred by the Debtor and its principals in December of 2005 based upon an extension of credit given on three separate notes: (1) $2,200,000.00 on what is called a cow note; (2) $150,000, on what is referred to as an equipment note; and (3) $4,700,000.00 on what is termed a construction note. The proceeds of the loans were used by the Debtor to satisfy existing obligations as well as to finance an expansion of its business operations. (Doc. No. 300).

As security for the three notes, the Debtor, together with the Arts, pledged substantially all of their property, both real and personal. On the date the Debtor filed its petition for relief, AgStar claimed that it was "owed not less than $6,403.007.06." (Doc. No. 300, ¶ 12). To adequately protect AgStar's interest, the Debtor has paid to AgStar since the commencement of this case between $26,900.00 to $57,000.00 per month. (Doc. No. 300, Ex. B).

On April 19, 2010, the Debtor filed its second modified proposed plan of reorganization. (Doc. No. 141). Under this plan, the Debtor proposed to pay AgStar's secured claim at the rate of $60,418.52 per month based upon the following allocations: (1) on the construction note, AgStar would be paid $33,930.90 per month, based upon a 15-year period of amortization at a 5% rate of interest; (2) on the cow note, AgStar would be paid $24,243.18 per month, based upon a 7-year period of amortization at a 5.42% rate of interest; and (3) on the equipment note, AgStar would be paid $2,244.44 per month, based upon a 5-year period of amortization at a 5.42% rate of interest. Monthly payments under its plan would be made for a period of up to five years, with the Debtor providing that on or before the expiration of the five-year period, the remaining portion of AgStar's

Page 3

In re: Arts Dairy, LLC
Case No. 09-32386

claim would be satisfied through substitute financing from a yet to be determined source. (Doc. No. 284).

## DISCUSSION

The matter now before this Court concerns a determination of whether a plan of reorganization proposed by the Debtor should be confirmed. Determinations concerning plan confirmation are deemed by bankruptcy law to be core proceedings. 28 U.S.C. § 157(b)(2)(L). Accordingly, as a core proceeding, this Court has jurisdiction to enter final orders and judgments on the matter of confirmation. 28 U.S.C. § 157(b)(1).

Chapter 11 of the United States Bankruptcy Code is rehabilitative, allowing financially distressed businesses or individuals to restructure their financial affairs, usually through a continuation of the business operation or through an orderly liquidation, with the debtor then exiting bankruptcy relieved of the burdensome debts and obligations which necessitated the bankruptcy filing. A debtor most typically effectuates their rehabilitation through the implementation of a plan of reorganization.[1] As a prerequisite to a debtor implementing a plan of reorganization, the plan must be confirmed by the court. 11 U.S.C. § 1142.

Once confirmed by the bankruptcy court, a Chapter 11 plan of reorganization operates as a new and binding contract between the debtor and the debtor's creditors. 11 U.S.C. § 1141. It has the effect of discharging a debtor's prepetition obligations and replacing them with the allowed claims

---

[1] *Bank of America National Trust & Savings Ass'n v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 465 fn. 4, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) ("Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case."). *Compare* 11 U.S.C. § 363 (read so as to allow, in the absence of a plan, a sale of substantially all of a debtor's assets).

Page 4

In re: Arts Dairy, LLC
Case No. 09-32386

of the debtor's creditors. *In re Troutman Enterprises, Inc.*, 253 B.R. 8, 11 (6th Cir. B.A.P. 2000). Confirmation of the plan also operates as a final judgment that is entitled to *res judicata* effect. *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 463 (6th Cir. 1991).

Section 1129 of the Bankruptcy Code sets forth the conditions necessary to have a plan confirmed. The plan proponent bears the burden of establishing to the satisfaction of the Court that the conditions set forth in § 1129 have been satisfied. *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1165 (5th Cir. 1993). Among the statute's requirements, § 1129(a)(11) provides:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> > (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Colloquially, this prerequisite to plan confirmation is referred to as "feasibility." A proposed plan that is not feasible cannot be confirmed by the Court.

The feasibility requirement of § 1129(a)(11) is meant to protect creditors against unrealistic plans that have little or no chance of success. *In re Adelphia Business Solutions, Inc.*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003). It has been expressed in this regard that creditors should not be expected to be bound by the terms of plans entailing visionary schemes which promise creditors more than the debtor can possibly deliver. *In re Danny Thomas Props. II Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001).

At the same time, the feasibility requirement of § 1129(a)(11) is not a rigorous one. *In re Machne Menachem, Inc.*, 371 B.R. 63, 71 (Bankr. M.D. Pa. 2006). Debtors emerging from a Chapter 11 case are, by definition, attempting to overcome difficult financial circumstances. Thus, the

Page 5

**In re: Arts Dairy, LLC**
**Case No. 09-32386**

proponent of a Chapter 11 plan need not show that success is guaranteed; nor is it fatal for the debtor that a possibility of failure is shown. Rather, when a business seeks to reorganize, only a reasonable assurance of commercial viability is required to establish feasibility for purposes of § 1129(a)(11). *In re Briscoe Enter., Ltd., II*, 994 F.2d at 1165-66.

When assessing the future commercial viability of a debtor's business, the question of feasability under § 1129(a)(11) is fundamentally one of whether the debtor has the ability to meet its future obligations, both as provided for in the plan and as may be incurred in its business operations. 7 Collier on Bankruptcy, ¶ 1129.02[11], (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

This is necessarily a factually intensive inquiry, with the following information considered to be relevant:

(1) the adequacy of the debtor's capital structure;

(2) the earning power of the debtor's business;

(3) economic conditions that the debtor will face during the plan period;

(4) the ability of the debtor's present management;

(5) the probability of the continuation of the same management; and

(6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re U.S. Truck Co.*, 800 F.2d 581, 589 (6th Cir. 1986).

On the first of these considerations, the adequacy of the Debtor's capital structure, a number of points support the Creditor's position. What is first noticed is the underutilization of the Debtor's

Page 6

**In re: Arts Dairy, LLC**
**Case No. 09-32386**

assets. In 2005, the Debtor utilized its loan from the Creditor so as to effectuate an expansion of its dairy farm operation, with some of the proceeds of the loan used to obtain capital infrastructure. With this expansion, the Debtor's farm has a capacity of more than 1,600 dairy cows. Nonetheless, the Debtor has and intends to continue operating its business with a herd level in the range of 1,250 dairy cows, approximately 75% of capacity.

On a forward going basis, this is bound to make things difficult for the Debtor. The evidence presented in this case shows that to warrant its present overhead, the Debtor needs to be running at or near capacity.[2] Therefore, in order to have a realistic chance of success, the Debtor's business operation needs to be adjusted, either by increasing the number of dairy cows or through retiring the infrastructure related to the excessive overhead costs. The Debtor's plan of reorganization, however, does neither.

Critically, the Debtor's plan of reorganization does not call for an infusion of capital. But as pointed out by AgStar: "In order for Debtor to bring its dairy farm to capacity, and assuming cows can be purchased at $1,500/head, Debtor would require a capital investment of approximately $619,500." (Doc. No. 172, at pg. 11). It was also brought to the Court's attention that for the Debtor to increase its herd size beyond 1,250, improvements will be required to a manure lagoon, necessitating an additional capital outlay.

In sum, without an infusion of capital, which could be used to either obtain additional dairy cattle or to reduce long-term costs associated with under utilized infrastructure, the Debtor's present capital structure will continue to be a burden, thereby making it difficult for the Debtor to withstand

---

[2] Testimony given by the Creditor's loan officer, John Grape, set forth that the Debtor needs at least 1,650 dairy cows to operate profitably.

Page 7

In re: Arts Dairy, LLC
Case No. 09-32386

the inherent ebbs and flows encountered in the dairy business. As will be discussed later, the proof of this statement is found in the financial losses the Debtor's business continues to incur.

In response, the Debtor partially faults AgStar for its capital structure, setting forth that during its expansion, AgStar improperly required the repayment of $450,000 on a line of credit in 2007 which drained funds which could have been utilized to expand the dairy herd. Yet, even assuming the Debtor's allegations are true does not change the reality that the Debtor's dairy facility is being underutilized, thereby making its capital structure potentially untenable. The Debtor's capital structure is also not the only deficiency related to the feasibility of the Debtor's proposed plan.

A key component of the Debtor's plan of reorganization involves a balloon payment whereby, no later than five years after the effective date of its plan, the Debtor proposes to fully satisfy the Creditor's claims by obtaining substitute financing. By definition, however, a balloon payment does not fully amortize a loan,[3] and thus simply puts off for another day that which cannot be accomplished at the present. Consequently, while the Debtor's inclusion of a balloon payment as a means of implementing its plan does not render, by itself, the plan unfeasible, it does raise a red flag. As recently put by another bankruptcy court: "Confirmation of a plan is suspect, however, unless some proof is offered to show that the funds will be available at the time the balloon payment is due." *In re American Trailer and Storage, Inc.*, 419 B.R. 412, 430 (Bankr. W.D.Mo. 2009) (internal citation and quotation omitted).

In this matter, the Debtor has yet to find a potential source from which alternative financing may be obtained. In addition, no source may ultimately exist, with evidence given in this case

---

[3]
*See, e.g.*, 12 C.F.R. § 226.5b(d)(5)(1) n.10b (defining a balloon payment for purposes of Regulation Z).

Page 8

**In re: Arts Dairy, LLC**
**Case No. 09-32386**

showing that the Debtor is unlikely to have, at the end of five years, a sufficient equity base to obtain alternative financing. At the end of five years, the Debtor projects that it will have paid $2,350,714.79 on AgStar's $6,100,000 secured claim. (Doc. No. 283, Ex. 3). Thus, even assuming a best case scenario – meaning that no overall depreciation in its asset base occurs and the Debtor is able to meet all of its financial goals – the Debtor will have an equity base of 38%, leaving it short of the 40% minimum equity base generally needed to obtain refinancing.

However, even discounting the concerns already discussed, the Debtor's cash flow, both historical and projected, does not lend itself to a finding of feasibility. This weakness goes directly to the second and third factors, listed earlier, when assessing feasibility: (1) the earning power of the debtor's business, and (2) the economic conditions that the debtor will face during the plan period. The Debtor's weakness in these areas is especially critical given that these two considerations assess whether a debtor's business will be able to generate sufficient revenue to continue its business operations and return to profitability. *In re Trans Max Technologies, Inc.*, 349 B.R. 80, 92 (Bankr. D.Nev. 2006). A number of matters brought to the Court's attention are relevant in this regard.

Foremost, the ability of the Debtor's business to consistently operate profitably remains in doubt. From a historical perspective, the Debtor has been unprofitable for eight of the ten years of its existence. Recently, in 2009, the year it sought bankruptcy relief, the Debtor had a net operating loss of $1,321,968. The Debtor's operating losses then continue through the present, with the Debtor having lost in the first quarter of 2010 more than $84,000.00.

To be sure, Chapter 11 is intended to allow a debtor the opportunity to restructure their financial affairs so as to return to profitability. *Canadian Pacific Forest Products, Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1442 (6th Cir.1995). However, this opportunity does not continue in perpetuity, and in this matter, after more than a year under the protection of the

Page 9

In re: Arts Dairy, LLC
Case No. 09-32386

Court, there remains significant doubt whether the Debtor will be able to return to profitability in a timely manner.

Importantly, since filing for bankruptcy relief, the Debtor has lost, even with the benefit of the automatic stay, the sum of $617,466. Such losses are also expected to continue, with the Debtor's own financial projections showing that, even if its plan of reorganization were to be confirmed, it still anticipates losing money for the next five months, through October of 2010. (Doc. No. 283, Ex. 6). Furthermore, the financial projections submitted by the Debtor, although showing an eventual return to profitability, appear overtly optimistic. In particular, the Debtor has likely overstated its production and understated both its necessary costs and the price it will receive for the sale of milk.

First, on the production side, the Debtor's financial projections anticipate that it will soon be producing above 64.6 lbs. of milk per/cow per/day. However, the Debtor did not introduce any evidence as to how it will achieve this goal, with the evidence showing that the Debtor has traditionally operated below this level. For example, between December 30, 2009 and May 11, 2010, the Debtor averaged 61.9 lbs. of milk per/cow per/day.

The financial projections submitted by the Debtor also fail to include any expenditure related to capital replacement costs. But as pointed out by AgStar, "[c]apital items, such as machinery, vehicles, buildings and milking equipment, are used in the business. The cost of their purchase properly is not included as an operating cost. The cost of use, however, is a critical and legitimate cost for every farm." (Doc. No. 300, at pg. 31).

Concerning the price of milk, the mainstay of the Debtor's business revenue, the financial projections submitted by the Debtor rely on prices no longer reflected on the milk-futures market. Again, for example, the Debtor's financial projections contain a June 2010 milk future price of

Page 10

**In re: Arts Dairy, LLC**
**Case No. 09-32386**

$14.57; as of May 18, 2010, however, the milk price future for June 2010 was $13.76. With lower commodity prices, the Debtor's business revenue is unlikely to fully meet expectations.

The Court recognizes, as pointed out by the Debtor, that any projection concerning farm income and expenses is not an "exact science." (Doc. No. 307, at pg. 18, *citing In re Cheatham*, 91 B.R. 377, 379 (E.D.N.C. 1988)). Thus, as stated by the Supreme Court in *Protective Com. for Ind. Stock v. Anderson*, in estimating future performance "'mathematical certitude' is neither expected nor required." 390 U.S. 414, 452, 88 S.Ct. 1157, 1177, 20 L.Ed.2d 1 (1968). The difficulty, however, for the Debtor is this: Its own budgetary assumptions show that it is operating on a razor's edge, leaving no room for error.

At the end of five years, the Debtor expects that its total profit will be $102,482.60, representing $1,708.04 per month or just .5% of the Debtor's total projected income. Given such a small profit margin, the Debtor has no ability to withstand any unforseen contingencies that will arise in its business operation. Contingencies, requiring the outlay of additional financial resources, however, are inevitable given the nature of the Debtor's business. As observed in *In re Cheatham*, which the Debtor cited with favor: "In a farm economy, projections over long periods of time are treacherous. Markets are subject to wide swings. Weather is never predictable. Government programs come and go." 91 B.R. 379, *quoting In re Fursman Ranch*, 38 B.R. 907, 912 (Bankr.W.D.Mo. 1984).

## CONCLUSION

For those reasons set forth herein, as well as for those reasons stated at the Hearing held on confirmation, the Court cannot find that the Debtor has sustained its burden of showing that its proposed plan of reorganization is "feasible" for purposes of 11 U.S.C. § 1129(a)(11). As such, the law requires that the Court sustain the Objection of AgStar to Confirmation of the Debtor's Second

Page 11

In re: Arts Dairy, LLC
Case No. 09-32386

Modified Plan of Reorganization. In denying confirmation, it is this Court's overall observation that the Debtor's proposed plan fails, not because of mismanagement, but because the Debtor expanded too fast and, as a result, became overleveraged in a volatile market.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that the Objection of Agstar Financial Services, FLCA and Agstar Financial Services, PCA to Confirmation of the Debtor's Second Modified Plan of Reorganization, be, and is hereby, SUSTAINED.

Dated: May 25, 2010

_____
Richard L. Speer
United States
Bankruptcy Judge

Page 12

# **_CERTIFICATE OF SERVICE_**

Copies were mailed this 25th day of May, 2010, to the following parties:

Arts Dairy, LLC
5624 Elm Sugar Road
Convoy, OH 45832

Shumaker, Loop & Kendrick LLP
1000 Jackson St
Toledo, OH 43604

Raymond L Beebe
Raymond L Beebe Co LPA
1107 Adams St
Toledo, OH 43604

Nathan A. Hall
1000 Jackson
Toledo, OH 43604-5573

Steven L Diller
124 E Main St
Van Wert, OH 45891

David Daniel Farrell
Thompson Coburn LLP
One US Bank Plaza, Suite 3200
Saint Louis, MO 63101

Benjamin Heywood
Lyden, Liebenthal & Chappell, Ltd.
5470 Main St
#300
Sylvania, OH 43560

Michael C. Jones
P.O. Box 274
762 North Williams Street
Paulding, OH 45879

Michelle T Sutter
Office of Attorney General
30 East Broad Street
25th Floor
Columbus, OH 43215

Nancy A Valentine
Hahn, Loeser & Parks LLP
200 Public Square
Suite 2800
Cleveland, OH 44114

Christopher B. Wick
Hahn Loeser + Parks LLP
200 Public Square
Suite 2800
Cleveland, OH 44114

Kirk E Yosick
Gallagher, Stelzer & Yosick, Ltd.
216 S Lynn St
Bryan, OH 43506

Office of the U.S. Trustee
201 Superior Ave, E, #441
Cleveland, OH 44114


/s/ Robert C.W. Birmingham
Deputy Clerk, U.S. Bankruptcy Court