## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| ARTS DAIRY, LLC, | : | Case No. 09-32386-rls |
| | : | |
| Debtor. | : | Judge Richard L. Speer |
| | : | |

## STIPULATION AND AGREED ORDER GRANTING RELIEF FROM AUTOMATIC STAY AND LIQUIDATION OF AGSTAR'S COLLATERAL

This Court convened an evidentiary hearing on May 20, 2010 to consider confirmation of

the *Second Modified Plan of Reorganization* [Docket No. 284] (the "Chapter 11 Plan") filed by

Debtor Arts Dairy, LLC (the "Debtor") on April 19, 2010, the *Objection of the AgStar Entities to*

*Confirmation of Debtor's Second Modified Plan of Reorganization* [Docket No. 300], and the

*Motion of AgStar Entities for Immediate Relief from the Automatic Stay* (the "Relief from Stay

Motion") [Docket No. 55] filed by AgStar Financial Services, FLCA ("FLCA") and AgStar

Financial Services, PCA ("PCA" and together with FLCA, "AgStar") on May 28, 2009.

### RECITALS

A.       Confirmation of the Chapter 11 Plan was denied by this Court at the May 20th

evidentiary hearing [Docket No. 308; Memorandum of Decision and Order at Docket No. 317].

Prior to a hearing to consider the Relief from Stay Motion, AgStar and the Debtor reached an

agreement in principle regarding granting AgStar relief from the automatic stay provisions of

Section[1] 362 and the liquidation of AgStar's Collateral[2].  The substance of such agreement and

---

[1] Unless otherwise indicated, all section references are to the current version of the Bankruptcy Code, 11 US.C. §§ 101, *et seq.* (the "Bankruptcy Code") and all rule references are to the current Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").
[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Relief from Stay Motion.

CLE - 2786031.1

the applicable terms and conditions are set forth in this *Stipulation and Agreed Order Granting Relief from the Automatic Stay and Liquidation of AgStar's Collateral* (the "Stipulation and Agreed Order"). The Official Committee of Unsecured Creditors does not oppose such relief.

B.      On May 20, 2010, this Court entered an order [Docket No. 309] granting AgStar's Relief from Stay Motion.

C.      On May 18, 2009, AgStar filed suit in the United States District Court for the Northern District of Ohio, Western Division (the "District Court") in a case styled *AgStar Financial Services, PCA, et al. v. Henk Arts aka HM Arts, aka Henricus Maria Arts, et al.*, Case No. 3:09-cv-01147 (the "Foreclosure Action"), seeking foreclosure of a mortgage on certain real property owned by Henk and Lamberta Arts (collectively, the "Arts Principals" and with the Debtor, and AgStar, the "Parties"). The Foreclosure Action is presently pending in the District Court. On November 25, 2009, AgStar filed Plaintiff's Motion for Summary Judgment in the Foreclosure Action.

D.      On August 7, 2009, the Debtor commenced an adversary proceeding in this Court styled *Arts Dairy, LLC v. Chris Parker d/b/a Jay Parker & Sons (In re Arts Dairy LLC)*, [Docket No. 118] Adv. Case No. 09-03159-rls (the "Parker Adversary Proceeding"), seeking recovery of the 114 dairy cows removed by Mr. Parker from Debtor's facility within 90 days prior to the Petition Date.

E.      On December 4, 2009, the Debtor filed that certain Verified Complaint to Enforce and Extend the Automatic Stay and for Injunctive Relief Against AgStar Financial Services, PCA and AgStar Financial Services, FLCA [Docket No. 198; Adv. Case No. 09-03307, Adv. Docket No. 1] commencing the adversary proceeding styled *Arts Dairy, LLC v. AgStar Financial Services, PCA, et al. (In re Arts Dairy, LLC)*, Case No. 09-32386, Adv. Case No. 09-03307 (the

2

"Injunction Adversary Proceeding") and Motion for Temporary Restraining Order and Preliminary Injunction [Adv. Docket No. 2] (the "Injunction Motion") seeking, among other things, to stay the Foreclosure Action and a finding that AgStar had violated the automatic stay by filing its Summary Judgment Motion in the Foreclosure Action.

F.      On December 14, 2009, this Court entered that certain Stipulation and Agreed Order Resolving Motion for Temporary Restraining Order and Preliminary Injunction [Adv. Docket No. 7] (the "Bankruptcy Stipulation") whereby the Injunction Motion was withdrawn and the time for the Arts Principals to respond to AgStar's Motion for Summary Judgment in the Foreclosure Action was extended until 14 days after the happening of the earliest to occur of the following events: (i) entry by this Court of an order either confirming or denying a previous iteration of the Chapter 11 plan; (ii) dismissal of the Debtor's Bankruptcy Case; (iii) conversion of the Debtor's Bankruptcy Case; or (iv) entry of an order in the Bankruptcy Case granting AgStar relief from the automatic stay. In addition, on December 22, 2009, the District Court entered an order (the "District Court Stipulation") [Foreclosure Action Docket No. 26] granting that certain Joint Motion to Approve Stipulation and Agreed Order Extending Time for Defendants to Respond to Plaintiffs' Motion for Summary Judgment [Foreclosure Action Docket No. 25], confirming the District Court's approval of the terms and conditions of the Bankruptcy Stipulation.

G.      The Parties agree to relief from the automatic stay upon the terms and subject to the conditions set forth below, and the Court hereby approves all such terms and conditions.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BY THE PARTIES AND IT IS HEREBY ORDERED, ADJUDGED AND DECREED BY THE COURT, THAT:

3

1.     All capitalized terms not herein defined shall have the same meaning as set forth in the Relief from Stay Motion. The effective date of this Stipulation and Agreed Order shall be May 20, 2010 (the "Effective Date"), consistent with Docket No. 309. The provisions contained in Bankruptcy Rule 4001(a)(3) relating to the stay of an order granting a motion for relief from an automatic stay are hereby waived.

2.     As of the Effective Date, AgStar is granted relief from the automatic stay imposed by Section 362(a) to exercise any and all remedies available to AgStar under the Notes, Mortgages, Security Agreements and other documents related thereto (collectively, the "Loan Documents"), including but not limited to the liquidation of AgStar's Collateral located at Debtor's facility consistent with the terms and conditions set forth in this Stipulation and Agreed Order.

3.     The Debtor's livestock (the "Cattle") shall be sold promptly and no later than fourteen (14) days from the date of entry of this Stipulation and Agreed Order unless otherwise agreed to by the Debtor and AgStar. The Debtor shall cooperate in the execution of any and all documents required to effectuate the sale of the Cattle.

4.     The Debtor or the Arts Principals represent and warrant that either of them is the fee owner of certain real estate commonly known as (a) 5624 Elm Sugar Road, Tully Township, Van Wert County, Ohio 45832-9578 (Permanent Parcel Nos. 1-000448.0000 and 01-000448.0200, (b) 2577 State Route 49, Benton Township, Paulding County, Ohio 45880, (Permanent Parcel No. 03-27-018.01) (c) 1233 SR 49, Convoy, Van Wert County, Ohio 45832-9569 (Permanent Parcel No. 01-000068.0101) and (d) farmland located at the corner of Feasby Wisener Road and SR 49, Convoy, Van Wert County, Ohio (the "Real Property") described on Exhibit A attached hereto and that to the best of Debtor's and the Arts Principals' knowledge the

CLE - 2786031.1

Real Property and farm chattels to be conveyed to AgStar pursuant to the provisions hereof are free and clear of all encumbrances except for the following:

- The existing Mortgages or security interests held by FLCA or PCA in the Real Property; and

- Any interest National City DND, Inc., fka National City Mortgage Services Co. ("National City") may have in real property located at 1233 SR 49, Convoy, Van Wert County, Ohio 45832-9569 (Permanent Parcel No. 01-000068.0101).

5.     The Debtor shall transfer to FLCA or its designee title to the Real Property pursuant to an *Agreement for Deed in Lieu of Foreclosure* (the "Deed in Lieu Agreement") to be executed by and among the Debtor, AgStar and the Arts Principals, and consistent with the terms and conditions of this Stipulation and Agreed Order and in form and substance acceptable to AgStar, within fourteen (14) days from the entry of this Stipulation and Agreed Order. The Arts Principals shall execute a quit-claim deed in favor of FLCA or its designee regarding all of the estate, right, title, lien, equity, interest, claim and demand that the Arts Principals may have in and to the Real Property. In addition, AgStar may require the Debtor and the Arts Principals to execute a Consent Judgment Entry in the Foreclosure Action, pursuant to which judgment shall be entered in favor of AgStar against the Debtor to foreclose on AgStar's interest in the Real Property.

6.     It is intended that any conveyance described in paragraph 5 shall be a conveyance of the entire interest of the Debtor and the Arts Principals in the Real Property and shall be for the purpose of granting AgStar, or its designee, absolute and total fee simple title to the Real Property. The conveyance described does not constitute any type of mortgage or security agreement, whether legal or equitable, and the Debtor and the Arts Principals intend to convey absolute fee simple title, with no reservation of any ownership interest of any kind. The Debtor and the Arts Principals acknowledge that, notwithstanding any conveyance to FLCA or its

CLE - 2786031.1

designee of fee title to the Real Property, AgStar's Mortgages shall remain in full force and effect, and conveyance shall not constitute a merger of the mortgage liens with the fee simple title. The Debtor and the Arts Principals understand that it is necessary for AgStar to retain its Mortgages in order to protect its existing position on the Real Property from any subordinate liens that may now exist or may arise prior to the recording of the deeds. While the Debtor and the Arts Principals represent and warrant that they have not created any subordinate liens other than those appearing of record or disclosed in writing to AgStar, they nevertheless recognize that it is necessary for AgStar to retain its rights to terminate any disclosed or undisclosed subordinate liens by appropriate mortgage foreclosure proceedings, and accordingly, acknowledge and agree to AgStar continuing to prosecute the Foreclosure Case. In addition, the Debtor and the Arts Principals recognize that AgStar has no intention of voluntarily satisfying or otherwise releasing its Mortgages and shall not, under any circumstances, be obligated to voluntarily satisfy any portion of its Mortgages, regardless of subordinate liens, except as provided herein. AgStar shall have the right, in its sole discretion, to determine which of its Mortgages will be foreclosed, how many, and in which order.

7.     In consideration for compliance with the terms of this Stipulation and Agreed Order, AgStar shall not sue the Arts Principals for any liability in respect of, related to, or arising from their co-borrower obligations to AgStar under the Notes.

8.     In further consideration for compliance with the terms of this Stipulation and Agreed Order, the Arts Principals shall receive for June 2010 a family living draw of $7,500.00 (the "Family Draw").

9.     Finally, in further consideration for compliance with the terms of this Stipulation and Agreed Order, AgStar shall wire to Arts Principals' bank account $50,000.00 (the "Exit

6

Payment") no later than ten (10) business days after (a) entry of this Stipulation and Agreed Order; (b) completion of the sale of the Cattle; and (c) execution of the Deed in Lieu Agreement or transfer of title to the Real Property to AgStar or its designee. Furthermore, the Arts Principals understand that their cooperation with AgStar and their timely performance of their duties and obligations hereunder are material inducements to AgStar agreeing to the Exit Payment.

10.     Pending sale of the Cattle and completion of the transfer of the Real Property, the Debtor (a) will cooperate with Development Specialists, Inc. ("DSI") and its agents and employees in effectuating the sale of the Cattle, (b) will allow DSI to have a daily presence at Debtor's dairy farm in order to (i) assess management and operations and make recommendations to AgStar as to expenses to be incurred by the Debtor in preservation of the Debtor's assets pending liquidation, (ii) ensure proper care and preservation of the Cattle, (iii) obtain from AgStar protective advances to preserve Debtor's assets pending liquidation without the necessity of the Debtor or DSI complying with Section 364; and (iv) provide general oversight to AgStar of the wind-down of the dairy operations and liquidation of the Debtor's assets.

11.     At AgStar's request, the Debtor will retain a chief liquidating officer, which could be DSI, to take responsibility for the liquidation of AgStar's Collateral in cooperation with AgStar. Any fees and expenses of a retained chief liquidating officer shall be paid out of the sale of AgStar's Collateral.

12.     Upon entry of this Stipulation and Agreed Order, the Debtor shall turn over to AgStar all the remaining funds held in the Debtor's bank accounts, all of which comprises AgStar's cash collateral, in the approximate amount of $150,000 plus any recently received milk

CLE - 2786031.1

proceeds and patronage dividends from the Michigan Milk Producers Association ("MMPA"), pursuant to wire instructions supplied to the Debtor's counsel. Such funds will be applied to the amounts due and owing under the Notes. AgStar agrees to make protective advances to DSI or the retained chief liquidating officer for the account and benefit of the Debtor, as may be necessary to preserve and protect the Debtor's assets pending liquidation.

13.     Within fourteen (14) days from the date of the entry of this Stipulation and Agreed Order, the Parties shall execute an Equipment Surrender Agreement (the "Surrender Agreement") whereby the Debtor shall surrender, deliver and grant to AgStar, or its designees, peaceful possession of all of the machinery and equipment comprising the Collateral (the "M&E Collateral") located at the Debtor's dairy farm or elsewhere. Such surrender shall be made to AgStar or its designee in recognition of AgStar's rights as a secured party under the Uniform Commercial Code (the "UCC") and other applicable law and to allow AgStar to conduct a secured party sale of the M&E Collateral pursuant to Article 9 of the UCC. In connection with the Surrender Agreement, the Debtor hereby (a) acknowledges that it is in default under the Loan Documents and in the payment of its obligations to AgStar; (b) confirms that the amount of the obligations due and owing by the Debtor to AgStar as of the Effective Date is not less than $6 million plus (i) accrued and accruing interest thereon, (ii) AgStar's expenses and attorneys' fees and (iii) all other amounts, now existing or hereafter arising, payable to AgStar under the Loan Documents or otherwise, all without offset, defense or counterclaim of any nature or description; (c) acknowledges that AgStar has a valid, perfected, first priority lien on the Collateral securing the payment and performance of the Obligations; (d) confirms that the Debtor does not have the capital to continue its business or the means to protect the Collateral; (e) waives all of its rights to notification or otherwise under the UCC or other law as to the sale or other disposition by

8

AgStar of the Collateral, regarding acceptance of the Collateral as a discharge of the Debtor's obligations to AgStar, and regarding the Debtor's right to redeem the Collateral; (f) acknowledges that the transfer of the M&E Collateral shall not constitute a merger with AgStar's security interests therein; and (g) acknowledges that AgStar shall retain its security interests in all M&E Collateral after acquiring title thereto until such time that AgStar executes a written release of a portion or all of said M&E Collateral. No disposition of any M&E Collateral shall be made other than with AgStar's consent, and any M&E Collateral in the custody of any party shall be held as AgStar's agent and subject to AgStar's sole instruction.

14.     All income generated from or relating to the Debtor's dairy operation shall be paid directly to AgStar, including, but not limited to, all milk checks and milk loss payments. The Parties agree that the appropriate operating expenses (including the Debtor's attorney's fees, up to a maximum of $10,000.00 as set forth below in paragraph 18) will be paid out of the proceeds received by AgStar from milk checks or income generated from operation of the dairy facilities. Out of the milk check revenues it receives, AgStar will release back to the Debtor funds to cover appropriate operating expenses that have been approved in advance by AgStar, or AgStar may, at its sole discretion, pay those expenses directly. If income generated from the operation is not sufficient to cover expenses, then proceeds from the sale or liquidation of the farm chattels and Cattle may be used to cover any shortfalls. Other than those expenses approved by AgStar, no other income from the operation of the dairy or proceeds from the sale of any farm chattels or other property to be conveyed herein shall be used to pay any other bills or expenses of the Debtor or the Arts Principals, and AgStar shall not be responsible, nor does it assume or undertake the responsibility for, paying any other bills, costs or expenses, and the

CLE - 2786031.1

Debtor shall hold AgStar harmless and indemnify AgStar from any such other expenses, creditors or bills.

15.    Upon entry of this Stipulation and Agreed Order, the Debtor shall execute and deliver to AgStar an assignment of all milk proceeds and patronage dividends from MMPA to AgStar in a form acceptable to AgStar; and all other funds otherwise payable to the Debtor shall be directed to AgStar.

16.    Stock interests in AgStar or its parent AgStar stock held by the Arts Principals or the Debtor will be promptly tendered for redemption and the proceeds applied against the indebtedness owed to FLCA and PCA by the Debtor. In addition, as provided in AgStar's By-Laws, any patronage equities earned by the Debtor or the Arts Principals will be used to offset any shortfalls or losses on the PCA and FLCA loans respectively.

17.    The Debtor and the Arts Principals shall assign to AgStar or take other steps as necessary to provide AgStar with rights to or the value from all MMPA Cooperative stock or MMPA Cooperative patronage equity or dividends.

18.    AgStar agrees to cover the Debtor's attorneys' fees and expenses as may be approved by this Court that are incurred from and after May 21, 2010 through the completion of the Debtor's and the Arts Principals' obligations pursuant to this Stipulation and Agreed Order, in an amount not to exceed $10,000.00.

19.    The Debtor and the Arts Principals represent, warrant and agree that they will refrain from taking any action to injure, hypothecate, or cause further deterioration in the value of the Debtor's assets and shall fully cooperate in the orderly wind-down and liquidation of the Debtor's assets. If the Debtor or the Arts Principals fail to fully cooperate in the sale of the Cattle, in the management and operation of the dairy farm pending liquidation or in the orderly

CLE - 2786031.1

liquidation of the Debtor's assets, or otherwise cause injury or deterioration in the value of the Debtor's assets pending liquidation, then the Family Draw, the Exit Payment, and obligation to pay Debtor's Counsel's allowed attorneys' fees as set forth in paragraph 18 shall be revoked.

20. In addition to the fees referenced in Paragraph 18, AgStar shall cover the Debtor's attorneys' fees and expenses as may be approved by this Court that are incurred from and after May 28, 2010 through the completion of the resolution of the Parker Adversary Proceeding, in an amount not to exceed $5,000.00, to ensure that the Parker Adversary Proceeding is fully adjudicated, including any appeal therefrom. AgStar's counsel shall participate with the Debtor's counsel and/or the Unsecured Creditors' Committee's counsel in any settlement discussions with the Parker Adversary Proceeding defendants or internal litigation strategy meetings. The Debtor and AgStar agree to divide any proceeds resulting from a judgment or settlement of the Parker Adversary Proceeding with 66.6% of any proceeds being directed to the Debtor and 33.3% being directed to AgStar. The Debtor's portion of such proceeds shall be used to pay allowed administrative expenses of the Debtor's estate on a *pro rata* basis.

21. Within five (5) business days of entry of this Stipulation and Agreed Order, the Debtor shall file a motion to dismiss the Injunction Adversary Proceeding with prejudice in a form and substance acceptable to AgStar.

22. The Parties each agree that, because of the unique nature of the obligations set forth above, in the event of a default by any Party, the non-defaulting Party may apply to this Court for a decree of specific performance against the defaulting Party. The Parties each acknowledge that, in the event of a default, it may not be an adequate remedy to declare this Stipulation and Agreed Order null and void or to seek any type of money damages or other relief. Accordingly, the non-defaulting Party shall have the option to seek a decree of specific

CLE - 2786031.1

performance against a Party that is in default. The non-defaulting Party, however, shall not be required to seek a decree of specific performance, but rather, the seeking and obtaining of such a decree shall be an option in addition to any and all other legal remedies that might be available because of such default.

23.    Except to the extent governed by the Farm Credit Act, this Stipulation and Agreed Order will be governed by the laws of the State of Ohio.

24.    The Court retains jurisdiction for purposes of enforcement of this Stipulation and Agreed Order. Notwithstanding the foregoing, the Parties shall cause a copy of this Stipulation and Agreed Order to be filed in the Foreclosure Action.

Dated: _____6 / 7 / 1 0_____    IT IS SO ORDERED.

    _____
    Judge Richard L. Speer

AGREED BY:

/s/ Christopher B. Wick_____      /s/ Nathan A. Hall_____
Lee D. Powar (0033679)      H. Buswell Roberts, Jr. (0004747)
Nancy A. Valentine (0069503)      David J. Coyle (0038966)
Christopher B. Wick (0073126)      Nathan A. Hall (0077014)
Hahn Loeser & Parks LLP      SHUMAKER, LOOP & KENDRICK, LLP
200 Public Square, Suite 2800      North Courthouse Square
Cleveland, Ohio 44114      1000 Jackson Street
Telephone: (216) 621-0150      Toledo, Ohio 43604-5573
Facsimile: (216) 241-2824      Telephone (419) 241-9000
E-Mail: ldpowar@hahnlaw.com      Facsimile (419) 241-6894
       navalentine@hahnlaw.com      E-Mail: broberts@slk-law.com
       cwick@hahnlaw.com            dcoyle@slk-law.com
                                    nhall@slk-law.com
*Attorneys for AgStar Financial Services, FLCA*   *Attorneys for Debtor and Debtor-in-Possession*
*and AgStar Financial Services, PCA*

/s/ Raymond L. Beebe_____
Raymond L. Beebe (0027096)
Raymond L. Beebe Co., LPA
1107 Adams St.
Toledo, OH 43624

12

CLE - 2786031.1

## EXHIBIT A

(a)    **5624 Elm Sugar Road, Convoy, Ohio 45832-9578**
       **(Permanent Parcel Nos. 1-000448.0000 and 01-000448.0200)**

Situated in the County of Van Wert in the State of Ohio and in the Township of Tully, to-wit:

A parcel of land being the West half (1/2) of the Northeast quarter (1/4) of Section 11, Town 1 South, Range 1 East, Tully Township, Van Wert County, Ohio, and which is more particularly described as follows:  Commencing at a cotton gin spindle found at the Northeast corner of the Northeast quarter (1/4) of said Section 11; thence North 88 degrees 58' 57" West (assumed bearing for the purpose of this description) on the North line of the Northeast quarter (1/4) of said Section 11 and the centerline of Elm Sugar Lane Road No. 214, one thousand three hundred twenty-two and ten hundredths (1322.10) feet to a mag nail set at the Northwest corner of the Wet half (1/2) of the Northeast quarter (1/4) of said Section 11 and the point of beginning; thence South 0 degrees 57' 00" West on the East line of the West half (1/2) of the Northeast quarter (1/4) of said Section 11, two thousand six hundred forty-two and twenty-three hundredths (2642.23) feet to a 5/8" x 30" iron pin with reference cap set at the Southeast corner of the West half (1/2) of the Northeast quarter (1/4) of said Section 11; thence North 89 degrees 03' 44" West on the South line of the Northeast quarter (1/4) of said Section 11, one thousand three hundred twenty and sixty-two hundredths (1320.62) feet to an iron pin found at the Southwest corner of the Northeast quarter (1/4) of said Section 11; thence North 0 degrees 55' 05" East on the West line of the Northeast quarter (1/4) of said Section 11, two thousand six hundred forty-four and eight hundredths (2644.08) feet a PK nail found at the Northwest corner of the Northeast quarter (1/4) of said Section 11 and in the centerline of Elm Sugar Lane Road No. 214; thence South 88 degrees 58' 57" East on the North line of the Northeast quarter (1/4) of said Section 11 and the centerline of Elm Sugar Lane Road No. 214, one thousand three hundred twenty-two and ten hundredths (1322.10) feet to the point of beginning.  Containing 80.178 acres of land more or less, but subject to all legal highways and easements of record.  This description is based on filed Survey No. 6320A-VW-T-1-10-00, by Paul J. Westhoven, Registered Surveyor No. 5602.

Less and Except:

Situated in the Township of Tully, County of Van Wert, and State of Ohio, and known as:

A parcel of land being a part of the West half (1/2) of the Northeast quarter (1/4), Section Eleven (11), Town One (1) South, Range One (1) East, Tully Township, Van Wert County, Ohio, and which is more particularly described as follows:  Beginning at a PK nail found at the Northwest corner of the Northeast quarter (1/4) of Section 11; thence South 88 degrees-58' -57" East (assumed bearing of the purposes of this description) on the North line of the Northeast quarter (1/4) of said Section 11 and the centerline of Elm Sugar Lane Road No. 214, four hundred sixty-six and seventy hundredths (466.70) feet to a mag nail set; thence South 0 degrees-55' -05" West and parallel with the West line of the Northeast quarter (1/4) of said Section 11, four hundred sixty-six and seventy hundredths (466.70) feet to a 5/8" x 30" iron pin with ID cap set; thence North 88 degrees-58' -57" West and parallel with the North line of the Northeast quarter (1/4) of said Section 11, four hundred sixty-six and seventy hundredths (466.70) feet to a 5/8" x 30" iron

pin with ID cap set on the West line of the Northeast quarter (1/4) of said Section 11; thence North 0 degrees-55' -05" East and parallel with the West line of the Northeast quarter (1/4) of said Section 11, four hundred sixty-six and seventy hundredths (466.70) feet to the point of beginning, containing 5.000 acres of land, more or less, subject to legal highways.

**(b)  2577 State Route 49, Benton Township, Paulding County, Ohio 45880
(Permanent Parcel No. 03-27-018.01)**

Situated in the Township of Benton, County of Paulding, and State of Ohio, and known as:

Being a part of the Northeast quarter (1/4) of Section 27, Town 1 North, Range 1 East, Benton Township, Paulding County, Ohio, and which is more particularly described as follows:

Commencing at a cornerstone and iron pin in steel monument box found at the Northeast corner of said Section 27; thence South 00 degrees 00 minutes 00 seconds West, (assumed bearing for the purpose of this description), on the East line of the Northeast quarter (1/4) of said Section 27 and the centerline of State Route No. 49, two thousand one hundred twenty-nine and sixty-four hundredths (2129.64) feet to a mag nail set and the point of beginning; thence continuing South 00 degrees 00 minutes 00 seconds West, on the East line of the Northeast quarter (1/4) of said Section 27 and the centerline of State Route No. 49, two hundred fifty-six and zero hundredths (256.00) feet to a mag nail set; thence South 89 degrees 59 minutes 21 seconds West, forty and zero hundredths (40.00) feet to a 5/8" x 30" iron pin with reference cap set; thence continuing South 89 degrees 59 minutes 21 seconds west, two hundred thirty and zero hundredths (230.00) feet to a 5/8" x 30" iron pin with reference cap set; thence North 00 degrees 00 minutes 00 seconds East, two hundred fifty-six and zero hundredths (256.00) feet to a 5/8" x 30" iron pin with reference cap set; thence North 89 degrees 59 minutes 21 seconds East, two hundred thirty and zero hundredths (230.00) feet to a 5/8" x 30" iron pin with reference cap set; thence continuing North 89 degrees 59 minutes 21 seconds East, forty and zero hundredths (40.00) feet to the point of beginning.

**(c)  1233 SR 49, Convoy, Van Wert County, Ohio  45832-9569
(Permanent Parcel No. 01-000068.0101)**

Situated in the Township of Tully, County of Van Wert and State of Ohio and known as:

A parcel of land being situated in the South half (1/2) of the Northwest quarter (1/4) of the Northwest quarter (1/4) of Section 2, Town 1 South, Range 1 East, Tully Township, Van Wert County, Ohio, and which is more particularly described as follows:

Commencing at the Northwest corner of the Northwest quarter (1/4) of said Section 2; thence South 1 degree 03 minutes West (bearing as shown on the State Highway Plans for State Route No. 49) on the West line of the Northwest quarter (1/4) of said Section 2, one thousand one hundred sixty-nine and nine hundredths (1169.09) feet to the point of beginning; thence South 89 degrees 01 minutes 15 seconds East, two hundred ninety and forty hundredths (290.40) feet to an

CLE - 2785663.1

iron pin; thence South 1 degree 03 minutes West, one hundred fifty and zero hundredths (150.00) feet to an iron pin on the South line of the Northwest quarter (1/4) of the Northwest Quarter (1/4) of said Section 2; thence North 89 degrees 01 minutes 15 seconds West on the said South line of the Northwest quarter (1/4) of the Northwest quarter (1/4) of Section 2, two hundred ninety and forty hundredths (290.40) feet to a railroad spike at the Southwest corner thereof; thence North 1 degree 03 minutes East on the West line of the Northwest quarter (1/4) of said Section, one hundred fifty and zero hundredths (150.00) feet to the point of beginning.

Containing 1.00 acre of land, more or less, but subject to all legal highways.

### (d)     80 acres located at the corner of Feasby Wisener Road and State Route 49, Convoy, Ohio

A parcel of land being the West half (1/2) of the Southwest quarter (1/4) of Section 11, Town 1 South, Range 1 East, Tully Township, Van Wert County, Ohio, and which is more particularly described as follows:

Beginning at an iron pin found at the Southwest corner of the Southwest quarter (1/4) of said Section 11;

thence North 1 degree 00 minutes 00 seconds East (assumed bearing for the purposes of this description) on the West line of the Southwest quarter (1/4) of said Section 11, two thousand six hundred fifty and thirty-two hundredths (2650.32) feet to a 5/8" x 30" iron pin with reference cap set at the Northwest corner of the Southwest quarter (1/4) of said Section 11;

thence South 89 degrees 03 minutes 44 seconds East on the North line of the Southwest quarter (1/4) of said Section 11, one thousand three hundred eighteen and ninety-three hundredths (1318.93) feet to a 5/8" x 30" iron pin with reference cap set at the Northeast corner of the West half (1/2) of the Southwest quarter (1/4) of said Section 11;

thence South 0 degrees 57 minutes 33 seconds West on the East line of the West half (1/2) of the Southwest quarter (1/4) of said Section 11, two thousand six hundred forty-six and sixty-six hundredths (2646.66) feet to a 5/8" x 30" iron pin with reference cap set at the Southeast corner thereof;

thence North 89 degrees 13 minutes 16 seconds West on the South line of the Southwest quarter (1/4) of said Section 11, one thousand three hundred twenty and eighty-three hundredths (1320.83) feet to the point of beginning.

Containing 80.250 acres of land, more or less, but subject to all legal highways and easements of record.